**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**


**BPI ENERGY HOLDINGS, INC.
f/k/a BPI INDUSTRIES, INC. and
BPI ENERGY, INC., f/k/a
BPI INDUSTRIES (USA), INC.,**

  **Plaintiffs,**

**v.**

**IEC (MONTGOMERY), LLC, et al.,**

  **Defendants.**        **Case No. 07-cv-186-DRH**


<u>**MEMORANDUM & ORDER**</u>

**HERNDON, Chief Judge:**


**I. <u>Introduction</u>**

  Now before the Court is Defendants' Motion to Dismiss Counts 1 and 2 of Plaintiffs' Fourth Amended Complaint, made pursuant to **FEDERAL RULES OF CIVIL PROCEDURE 9(b)** and **12(b)(6)** (Doc. 195).  Count 1 of Plaintiffs' Fourth Amended Complaint (Doc. 183) pleads a claim of fraud in the inducement against Defendants and seeks rescission of contracts (*Id.* at ¶¶ 71-80).  Count 2 pleads a claim of promissory fraud against Defendants (*Id.* at ¶¶ 81-85).  Defendants advocate for the dismissal of both Counts 1 and 2 pursuant to **Rule 9(b)**, arguing that Plaintiffs have failed to plead either claim with the requisite particularity.

Defendants further argue that Plaintiffs have failed to state a claim for which relief can be granted, advocating for a dismissal of Counts 1 and 2 pursuant to **Rule 12(b)(6)** because the allegations do not show Defendants' material misstatements of fact, Plaintiffs' justifiable reliance  thereon, Plaintiffs' resultant damages or that Defendants employed a scheme or device to defraud Plaintiffs.

In their Response (Doc. 199), Plaintiffs argue that the allegations in their Fourth Amended Complaint are plead with sufficient particularity required of fraud claims and that they have also plead the necessary elements their fraud in the inducement/rescission claim as well as their promissory fraud claim.  Defendants have filed a Reply (Doc. 202) to the Response, which has also been considered in the Court's review of the Parties' briefings.  For the reasons discussed herein, the Court finds Plaintiffs' pleadings are sufficient to withstand Defendants' arguments for dismissal at this juncture.

## II.  Background

This case centers around two lease agreements concerning the mining rights of coalbed methane ("CBM"), collectively called the "CBM Leases."  Plaintiffs' Fourth Amended Complaint (Doc. 183) alleges claims for fraud in the inducement, promissory fraud, breach of contract, and tortuous interference with a contract. Plaintiffs seek recision of certain contracts transferring coal mining rights (or mining options) for their various Illinois properties to Defendants.  Additionally, Plaintiffs seek monetary damages for Defendants' alleged breach of the CBM Leases as well as

punitive damages for Defendants' alleged fraudulent and tortuous actions.

### III.  Discussion

**A.    Legal Standard**

When ruling on a motion to dismiss for failure to state a claim under **FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**, the Court must look to the complaint to determine whether it satisfies the threshold pleading requirements under **FEDERAL RULE OF CIVIL PROCEDURE 8.**  Rule 8 states that a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." **FED. R. CIV. P. 8(a)(2)**. The Supreme Court held that Rule 8 requires a complaint to allege "enough facts to state a claim to relief that is plausible on its face" to survive a Rule 12(b)(6) motion.  ***Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)**.  In other words, the Supreme Court explained it was "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief '" by providing "more than labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do . . . ."  ***Id.* at 555-56 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))**.  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'  ***Ashcroft v. Iqbal*, --- U.S.---, --- 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557)**.

Recently, in ***Iqbal***, the Supreme Court made clear that the federal pleading standard under **Rule 8** as discussed in its ***Twombly*** opinion applies "for all civil actions."  ***Id.* at ---, 129 S. Ct. at 1953**.  *Iqbal* identified the "two working

principles" underlying the decision in ***Twombly***: (1) "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice;" and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss." ***Id.* at ---, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555-56)**.  In short, a court should only assume to be true a complaint's well-pleaded factual allegations, and not its mere legal conclusions, when determining whether such allegations plausibly give rise to relief. ***Id.* at ---, 129 S. Ct. at 1950**.

FEDERAL RULE OF CIVIL PROCEDURE 9(b) requires allegations of fraud or mistake to be plead with particularity by including "'the who, what, when, where and how . . . .'" ***Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Serv., Inc.,* 536 F.3d 663 (7th Cir. 2008) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990))**.  The purpose of **Rule 9(b)**, in regards to fraud claims, "is to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual" because, if a fraud claim is too vague during discovery, the claim "will stand unrefuted, placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation." ***Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.,* 412 F.3d 745, 748-49 (7th Cir. 2005)**.

**B.      Analysis**

    **1.      Failure to Plead With Particularity**

        Defendants first argue for a dismissal of Plaintiffs' fraud claims as plead in Counts 1 and 2 of their Fourth Amended Complaint (Doc. 183) for failure to comply with the particularity requirement of **Rule 9(b)** despite having two years' time to conduct discovery (Doc. 195, pp. 6-8). Defendants assert that Plaintiffs have failed to specify the "who" in that they do not single out a particular Defendant in their allegations of fraud, but merely bring each cause of action against the "Drummond Affiliates." Similarly, Defendants also argue that Plaintiffs have failed to specify the alleged material misrepresentations at issue, or when and how they were made.

        In Response, Plaintiffs believe they have pleaded their fraud claims with sufficient particularity to withstand **Rule 9(b)** scrutiny. Plaintiffs use the term the "Drummond Affiliates" to describe Defendants because they allege that defendant Drummond Company, Inc. ("Drummond"), controls the remaining defendant corporate entities (*see* Doc. 183, ¶ 10). As Defendants are all related corporate entities, Plaintiffs believe that treating them as one overall entity will not impede Defendants' ability to determine their respective involvement (Doc. 199, p. 6, citing ***Jepson, Inc. v. Makita Corp.* 34 F.3d 1321, 1329 (7th Cir. 1994)**). However, Plaintiffs also point to several instances in the pleadings where they have further identified the "who" in regards to Defendants' alleged fraud. Plaintiffs allege that Drummond's general counsel, Bruce Weber, executed both the Memorandum of

Understanding ("MOU") between plaintiff BPI Industries, Inc., and defendant Vandalia Energy Company, LLC ("Vandalia"), and the Letter of Intent ("LOI"), between plaintiff BPI Industries, Inc., and defendant IEC (Montgomery), LLC ("IEC"), purporting to be the "President" of both (Doc. 183, ¶¶ 22-24, Exs. C & D).  Mr. Weber also signed the CBM Leases as "President" of IEC (*Id*. at ¶ 44, Exs. A & B).  Plaintiffs further allege that Drummond later claimed Mr. Weber did not have authority to sign either the MOU, LOI or CBM Leases (*Id*. at ¶ 58).

In addition, Plaintiffs argue that their allegations specify the "how" of their fraud claims in that Drummond, the related defendant entities, and employed personnel caused the agreements at issue in this suit to be executed without ever intending to honor any of them.  Plaintiffs' allegations of fraudulent behavior include Defendants' unauthorized signing of certain contracts and then their refusal to honor the "favorable terms," which Plaintiffs believed had been the benefit of their bargain.  The "favorable terms" are referenced as part of the MOU and LOI as the "favorable" CBM royalty rates Plaintiffs believed would be used between the contracting parties.  The allegations of the Fourth Amended Complaint continue to discuss Defendants' termination of the CBM Leases, which Plaintiffs believe Defendants never intended to honor.  The allegations also specifically list and attach the legal documents signed by the Parties (some of them being contracts, others being an MOU, LOI or certain Purchase Agreements), which lay out the foundation of an agreement for Plaintiffs to offer certain coal options to Defendants in exchange for leasing back the CBM rights at favorable royalty rates.

Examining Plaintiffs' Fourth Amended Complaint, it appears that Plaintiffs have provided the "who" in their allegations that Drummond, through both its general counsel, Bruce Webster, and some of its affiliated entities, such as defendant IEC and Vandalia, allegedly engaged in the fraudulent acts at issue in this suit.  Their allegations further detail the events leading up to the signing of the CBM Leases and Defendants' alleged breach thereof, listing dates and naming certain of Defendants and/or their personnel.  Additionally, Plaintiffs' allegations specify the various legal documents and contracts, providing details regarding contractual terms allegedly promised to be included in the CBM Leases and further describe the circumstances showing why Plaintiffs believe Defendants never intended to honor these contractual agreements.  The Court finds the fraud claims in Counts 1 and 2 of Plaintiffs' Fourth Amended Complaint are not vague, but instead are pleaded with sufficient particularity.  Therefore, Counts 1 and 2 shall not be dismissed for failing to comply with the pleadings requirements set forth in **Rule 9(b)**.

**2.    Failure to State a Claim Upon Which Relief May Be Granted**

Defendants also move for a dismissal of Counts 1 and 2, pursuant to **Rule 12(b)(6)**, for failure to state a claim upon which relief may be granted.

**a.    Count 1 - Fraud in the Inducement**

Under Illinois law, fraud in the inducement (also referred to as "fraudulent misrepresentation"), requires a showing that (1) the defendant made a false statement of material fact; (2) the defendant knew the statement was false at the

time of making it; (3) the statement was made with the intent to induce the plaintiff to act; (4) the plaintiff acted in reliance on the truth of the alleged statement; and (5) the plaintiff suffered damages because of the reliance. **Soules v. General Motors Corp., 402 N.E.2d 599, 601 (Ill. 1980)**. The plaintiff's reliance must also be justifiable, that is, the plaintiff must have had a right to rely on the alleged misrepresentation. **Id.**

First, Defendants argue that Plaintiffs' claim in Count 1 fails because Plaintiffs have not alleged a material misrepresentation, pointing out that Illinois does not recognize a cause of action for alleged false statements of future *intent* or *promises*. Instead, the misrepresentation must be one of present or preexisting *fact* that was false (Doc. 195, p. 10, citing **Ault v. C.C. Servs., Inc., 597 N.E.2d 720, 722 (Ill. App. Ct. 1992)**). Further, Defendants argue Plaintiffs' allegations do not evidence any justifiable reliance (Doc. 195, pp. 12-15).

In their Response, Plaintiffs appear to concede that a material misrepresentation must be one of present fact and not a mere promise or expression of opinion or intention (Doc. 199, pp. 7-8). However, Plaintiffs argue that their fraud in the inducement claim in Count 1 falls within an exception to the rule that a misrepresentation cannot be a promise of future intent. The exception to this rule, under Illinois law, is when a false promise as to future conduct was part of a scheme to accomplish the fraud. **See, e.g., Prime Leasing, Inc. v. Kendig, 773 N.E.2d 84, 92 (Ill. App. Ct. 2002)**. Plaintiffs further believe their allegations show

Defendants employed a fraudulent scheme to induce Plaintiffs to enter into a contractual relationship, ultimately to their detriment, as Plaintiffs also allege Defendants never intended to uphold their end of the bargain.

As explained previously, Plaintiffs envisioned a symbiotic relationship with Defendants, "under which the companies would work together and use their respective influence and resources to obtain additional CBM and coal rights in the Illinois Basin, would allow [plaintiff] BPI to extract CBM from coal ahead of the coal company's mining operations, and would allow the coal company to benefit from the proper removal of CBM from its coal beds" (Doc. 183, ¶ 20).  It is not that the CBM Leases did not initially contain the "favorable terms" Plaintiffs sought in royalty rates (*see* CBM Leases, Doc. 183, Exs. A & B, § 3.1).  Instead, Plaintiffs allege that Defendants only finally agreed to execute the CBM Leases upon Plaintiffs' threat that it would exercise a valuable coal option in the Osage Reserves on its own and make a transfer to Drummond later, once the leases were finalized (noting that they had been pending for over 15 months) (Doc. 183, ¶¶ 38 & 39).  Thereafter "[a]s a direct result of its fear that it would lose the right to purchase the valuable Osage Block [coal rights], the Drummond Affiliates executed the Osage Letter Agreement.  After significant delay, Bruce Webster signed two CBM Leases as 'president' of IEC . . ." (*Id*. at ¶ 44).  However, Plaintiffs further allege "the Drummond Affiliates had no intention of honoring these CBM Leases, as they were signed only after BPI insisted that the leases be signed as a condition of its willingness to transfer the Osage Reserves coal rights" (*Id*. at ¶ 45).  Plaintiffs continue, noting the favorable CBM

royalty rate, as well as the primary term on the CBM Leases of 20 years (*Id*. at ¶¶ 46 & 47, *see also* Exs. A & B, §§ 2 & 3).

After the signing of the CBM Leases, Plaintiffs' allegations detail Defendants' actions which they believe evidence Defendants' intent from the inception to never honor the contracts.  For example, Plaintiffs allege that Defendants failed to provide Plaintiffs with the agreed-upon maps of its existing and proposed wells so that Plaintiffs could begin the testing and extraction process (*Id*. at ¶¶ 50-54, "The Drummond Affiliates failed to provide the MPB's required by the CBM Leases to BPI within 90 days of the leases . . . .").  Several months after executing the CBM Leases, Plaintiffs' allegations show that Defendants, through Bruce Webster, sent a letter that the CBM Leases were in dispute, regarding, among other terms, the royalty rate. However, the letter made no mention of any breach by Plaintiffs (*Id*. at ¶ 55).

Plaintiffs further allege that Bruce Webster claimed he never read the CBM Leases before signing them and that Drummond falsely claimed BPI had bribed one of Defendants' employees, Kim Burke, to include these favorable royalty rates in the CBM Leases (*Id*. at ¶¶ 56 & 57).  Plaintiffs allege that Defendants also claimed Bruce Webster lacked authority to sign the CBM Leases, as he was not actually a company president and that Gary Drummond never personally approved them (*Id*. at ¶ 58).  However, Plaintiffs also point out that Bruce Webster also signed the purchase agreements for Plaintiffs' coal options and Defendants never claimed he lacked authority to sign those, because they wanted the coal rights all along (*Id*.).

Plaintiffs' allegations also describe their continuing efforts to comply

Page 10 of 14

with the terms of the CBM Leases, but how Defendants' failure to comply with the terms and their proposed revision of the CBM Leases containing substantially different and unfavorable terms prevented Plaintiffs from doing so (*Id*. at ¶¶ 59-62). For example, the CBM Leases were designated for a primary term of twenty years, but Plaintiffs allege that Defendants' proposed revision thereof reduced the primary term to three years, thereby making it impossible for Plaintiffs to do any meaningful CBM extraction in such a short time span (*Id*. at ¶ 62). Additionally, the revised leases contained higher royalty rates for Plaintiffs to pay (*Id*.). Plaintiffs allege that they ignored Defendants' proposed revisions and attempted to institute arbitration, but instead, Defendants sent them a Notice of Default and terminated the CBM Leases (*Id*. at ¶¶ 62-65). Ultimately, Plaintiffs allege that Defendants got all the benefit of the contractual relationship in that they ended up owning valuable property and coal rights purchased from Plaintiffs at a favorable cost, but that Plaintiffs never got their return benefit of the bargain in being allowed to mine the CBM from Defendants at favorable royalty rates for a reasonable time period (*Id*. at ¶¶ 67-70, "The collective result of the Drummond Affiliates' conduct was to take ownership of BPI's coal rights at the favorable cost BPI paid to obtain them and to give BPI nothing in return.").

Specifically, Plaintiffs argue their allegations show that Drummond ultimately wanted both the coal rights *and* CBM mining rights for itself and entered into the deal with Plaintiffs simply to obtain the coal option rights at a favorable price. Plaintiffs contend Defendants never intended to lease the CBM rights to

Plaintiffs at the favorable royalty rates originally discussed by the Parties.  Regarding the question of why did Plaintiffs enter into the contracts containing unfavorable terms, Plaintiffs explain that it was Defendants' behavior *after* the execution of the CBM Leases that truly sheds light on their fraudulent scheme employed to induce Plaintiffs to enter into the contractual relationship.

Keeping in mind the pleading standard noted in ***Twombly*** and ***Iqbal***, the Court finds Plaintiffs' allegations not to be mere conclusory statements reciting the elements for a claim of fraud in the inducement.  Rather, the Fourth Amended Complaint is replete with factual detail, including among other things, names, times, and contractual documents.  Thus, the Court should accept these allegations as true for the purposes of a **Rule 12(b)(6)** motion.  Accepting them as true, the Court also finds it plausible that Defendants may have employed a fraudulent scheme to induce Plaintiffs into entering into a contractual relationship that Defendants never intended to honor.  This is true even though such documents as the MOU and LOI have previously been found to be non-binding by this Court.  However, Plaintiffs' allegations show these documents are but part and parcel of Defendants' overall alleged "scheme."  The Court notes that the Parties did enter into CBM Leases which appear to contain what Plaintiffs allege to be "favorable royalty rates."  So, Defendants' argument that Plaintiffs cannot show justifiable reliance because the MOU and LOI themselves were non-binding is not well-taken.  Plaintiffs do allege that they relied upon these documents, however, because a cause of action for fraud does

not only deal in contractual provisions such as merger and integration clauses, but instead focuses on a party's behavior and actions; the MOU and LOI may thus be indicative of the course of dealings between the Parties.

Regarding Defendants' argument that Plaintiffs' request for rescission of contracts should not be available because Plaintiffs have not been damaged, the Court finds otherwise. Plaintiffs' allegations certainly reach the plausible threshold to seek relief for the damages caused by their justifiable reliance on Defendants' alleged fraudulent scheme to induce. Under **FEDERAL RULE OF CIVIL PROCEDURE 8(a)(3) & (d)**, a plaintiff is allowed to plead a claim for alternative types of relief. Whether rescission is the appropriate remedy in this situation remains to be seen and cannot be determined by this **Rule 12(b)(6)** analysis. Presently, the Court finds Defendants' grounds for dismissal of Count 1 of Plaintiffs' Fourth Amended Complaint pursuant to **Rule 12(b)(6)** to be unwarranted.

### b.    Count 2 - Promissory Fraud

Generally, Illinois law does not recognize a cause of action for promissory fraud: knowingly making a false promise of future conduct upon which another party relies. However, there is also an exception to this general rule as well. The exception is when the false promises made are shown to be part of a scheme to defraud. ***Trade Fin. Partners, LLC v. AAR Corp.***, 573 F.3d 401, 413 (7th Cir. 2009) (citing ***Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.***, 493 F.3d 841, 853 (7th Cir. 2007) (citing ***Bradley Real Estate Trust v. Dolan Assocs., Ltd.***,

**640 N.E.2d 9, 12-13 (Ill. 1994)**).  The Court realizes that this exception essentially mirrors the exception to Plaintiffs' fraud in the inducement claim.  However, as the Court has previously stated, Plaintiffs have a right to plead alternative theories of relief.  Plaintiffs seek rescission of contracts as a remedy for the fraud in the inducement claim in Count 1.  In Count 2, Plaintiffs seek compensatory and punitive damages.  For the same reasons as discussed *supra*, regarding Count 1, the Court finds Plaintiffs' allegations, when taking the well-pleaded ones as true, plausibly state a claim for promissory fraud within the exception under Illinois law.  As such, dismissal of Count 2 of Plaintiffs' Fourth Amended Complaint is also unwarranted under a **Rule 12(b)(6)** analysis.

## IV.  <u>Conclusion</u>

For the reasons stated herein, Defendants' Motion to Dismiss Counts 1 and 2 of Plaintiffs' Fourth Amended Complaint, made pursuant to **FEDERAL RULES OF CIVIL PROCEDURE 9(b)** and **12(b)(6)** (Doc. 195) is **DENIED**.

**IT IS SO ORDERED.**

Signed this 26th day of January, 2010.

*/s/  David R Herndon*

**Chief Judge**
**United States District Court**