IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BPI ENERGY HOLDINGS, INC.
f/k/a BPI INDUSTRIES, INC. and
BPI ENERGY, INC., f/k/a
BPI INDUSTRIES (USA), INC.,

      Plaintiffs,

v.

IEC (MONTGOMERY), LLC, et al.,

      Defendants.                        **Case No. 07-cv-186-DRH**

## MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

## I.  Introduction

      Now before the Court is Defendants' Motion for Summary Judgment (Doc. 238), to which Plaintiffs (collectively, "BPI") have timely responded in opposition (Doc. 246) and Defendants replied (Doc. 248).  Defendants move for summary judgment in their favor as to all four counts in BPI's Fourth Amended Complaint (Doc. 183), as well their Counterclaim (Doc. 196) for declaratory relief stating that they were legally justified in attempting to terminate the CBM Leases[1] due

---

[1] This case centers around two lease agreements concerning the mining rights of coalbed methane ("CBM"), collectively called the "CBM Leases."

to BPI's material defaults and inability to perform, and to require BPI to deliver a release reflecting termination of the CBM Leases and release the *lis pendens* it filed on the properties subject to the CBM Leases.

BPI's Fourth Amended Complaint (Doc. 183) pleads four separate counts for fraud in the inducement, promissory fraud, breach of contract, and tortuous interference with a contract.  BPI seeks recision of certain contracts which transferred coal mining rights (or coal purchase options) for their various Illinois properties to Defendants.  Additionally, BPI seeks monetary damages for Defendants' alleged breach of the CBM Leases as well as punitive damages for Defendants' alleged fraudulent and tortuous actions.  Although Defendants argue for summary judgment as to all four counts, BPI has consented to the dismissal of Counts III (breach of contract) and IV (tortuous interference with a contract) (*see* Doc. 246, p. 1, n.1), which the Court will allow.   Therefore, the focus turns to the issues regarding Defendants' alleged fraudulent behavior as well as the declaratory relief they seek. Based upon the reasoning herein, the Court finds Defendants entitled to summary judgment as to BPI's claims but not as to Defendants' counterclaim.

## II. __Background__

BPI is in the business of drilling for and producing coal bed methane ("CBM") gas.   Defendant Drummond Company, Inc. ("Drummond"), is in the business of mining coal.  BPI envisioned a mutually beneficial relationship for itself with a coal mining company, such as Drummond, in that it could offer its services to extract the CBM so that the coal could be safely mined afterward.  Although BPI

is a Canadian corporation, its principal place of business is in the state of Ohio. Having presence in the Midwest, it turned its attention to the potential mining of land comprising the Illinois Basin.  BPI concentrated its initial efforts on obtaining rights to extract CBM in the Illinois Basin, as well as obtaining options to purchase coal rights, separate from CBM rights.  After acquiring several coal purchase options from various counties in Illinois, BPI next looked for a potential buyer for these coal rights.   In short, BPI wanted to find a "strategic partner."   Of the companies responding to BPI's inquiry, Drummond appeared to fit the bill.

In 2004, BPI and Drummond entered into what BPI calls a "strategic alliance," in which the ultimate goal anticipated by BPI was for Drummond to purchase the coal options from BPI, exercise those options, and subsequently lease the CBM extraction rights for that coal to BPI.  Another key item essential to the strategic alliance was the mutual financial benefit that both BPI and Drummond would receive: Drummond would be able to purchase the coal option rights at a low cost and, in turn, it would lease the CBM extraction rights back to BPI.  BPI would then pay Drummond royalties on the CBM it extracted.  The royalties were to be at rates deemed favorable to BPI.

To establish and further this alliance, on August 4, 2004, BPI and defendant Vandalia Energy Company, LLC ("Vandalia"), a Drummond affiliate, entered into a Memorandum of Understanding ("MOU").  That same day, BPI also entered into a Letter of Intent ("LOI") with another Drummond affiliate, defendant IEC (Montgomery), LLC ("IEC").  The MOU addressed BPI's desire to exchange its

coal option rights in Christian, Clinton, and Shelby Counties for rights to CBM from a reserve located in Montgomery, Shelby, and Fayette Counties by way of a lease with IEC, a Vandalia affiliated company (*see* Doc. 238, Ex. 3, p. 1). The MOU also set forth the purchase price for the coal options and further stated that "BPI and Vandalia agree to work in good faith to acquire coal and coalbed methane rights to other large blocks of Herrin #6 seam coal in Illinois where mutually beneficial" (*Id*. at 2).

The LOI "set forth the outline of how the proposed strategic alliance between BPI and IEC can be developed following completion of due diligence by both BPI and IEC" (Doc. 238, Ex. 4, p. 2). The LOI was also to "serve as the basis for negotiations of final agreements that will specifically outline the relationship between the parties" (*Id*.). The strategic alliance was described therein as a situation where "BPI [could] assist IEC in expanding their coal interests and IEC [could] assist BPI in expanding their CBM . . . interests in the Illinois Basin" (*Id*.). In addition, the LOI stated that: (1) BPI would exercise its options to acquire the coal and rights as set forth in the LOI for Christian, Clinton, and Shelby Counties at a favorable cost to IEC or its designee; (2) BPI would give Defendants a right of first refusal on any additional coal rights it would acquire at cost; (3) Defendants would work to secure CBM rights for BPI as they acquired coal rights, including the acreage of coal rights they already owned and provide them at cost; (4) Defendants would give BPI a right of first refusal on any additional CBM rights they would acquire on the same terms and conditions as they  secured those rights; and (5) Defendants would exclusively

use BPI for its CBM degassing operations in connection with their coal mining operations in the Illinois Basin (*Id*. at 2-4).  Both the MOU and the LOI expressly stated that they were non-binding.  Nevertheless, BPI feels that these documents clearly evidenced the Parties' intent to maintain a relationship so that BPI would be able to lease CBM rights from Defendants at favorable rates and that, in turn, Defendants would obtain BPI's coal rights (or coal options) at cost (*see* Doc. 183, ¶ 25).

In order to transfer the various coal options it had acquired to Defendants, BPI first created the Shelby, Christian, Clinton, and Marion Coal Holdings LLC's (also Defendants in this action) (referred to collectively as the "Coal Holdings LLC's").  BPI then transferred its coal options to each of these newly-created LLC's via the County Coal Transfer Agreements (*see* Doc. 238, p. 2 and Exs. 7-10 (Shelby), 12-15 (Christian), 18-21 (Clinton), and 23-26 (Marion)).[2]  Next, BPI transferred ownership of these LLC's to IEC.  In consideration, IEC reimbursed BPI for its cost of the coal options.  IEC then exercised the coal options, paying the respective counties over $5 million in total to acquire the coal rights.  During this time, BPI claims that it made repeated requests for Defendants to execute the CBM leases that were integral to the MOU and LOI, but that Defendants refused to so.  Instead, according to BPI, it was only when it informed Defendants that it would

---

[2]  The transfer of BPI's coal option in Marion County, Illinois, to Marion Coal Holdings, LLC, did not actually occur until approximately a year after the transfers to the other three Coal Holdings LLC's.

exercise the Marion county coal option itself, rather than sell the option to IEC, that Defendants finally forwarded a draft lease for IEC's CBM rights in Montgomery, Christian, Fayette, and Shelby Counties, Illinois (*see* Doc. 238, Ex. 1).  This CBM Lease is referred to as the "Hillsboro CBM Lease" (Doc. 238, p. 2).  However, BPI also claims the draft lease did not comply with the spirit of the MOU and LOI, as it contained a short lease term, high royalty rates and multiple development commitments (Doc. 183, ¶¶ 32-33).

BPI was also able to secure another coal purchase option on property referred to as the "Osage Reserves."  BPI claims that only when it threatened to exercise its option to the Osage coal rights did Defendants finally provide the CBM leases with the "agreed upon" terms (Doc. 246, p. 2, ¶ 4).  Therefore, pursuant to what is known as the Osage Letter Agreement, dated March 1, 2006, entered into by BPI, IEC and Christian Coal Holdings, LLC ("Christian"), BPI agreed to sell its Osage Reserves coal option to Christian; Christian and IEC agreed to lease back the CBM rights to BPI (*see* Doc. 238, Ex. 28).

On April 26, 2006, BPI entered into two separate CBM Leases.  In one lease, referred to as the Hillsboro CBM Lease by the Parties, IEC agreed to lease to BPI the CBM rights for its Hillsboro tract of mineral lands, located in Christian, Fayette, Montgomery, and Shelby Counties, Illinois (*see* Doc. 238, Ex. 1).  BPI and defendant Christian also entered into what is referred to as the Osage CBM Lease, in which IEC agreed to lease to BPI its CBM rights for its Osage property, located in Christian and Montgomery Counties, Illinois (*see* Doc. 238, p. 2, Ex. 2).  The Parties

proceeded to conduct themselves in accordance to the terms and conditions of the two CBM Leases, however, BPI believes Defendants never had any intention of ever honoring these leases (*Id*. at ¶ 45).[3]

The Hillsboro CBM Lease includes a primary term of 20 years and a royalty rate (for BPI to pay Defendants on the extracted CBM) ranging from 6.25% up to 12.5%, depending on the price of natural gas (Doc. 238, Ex. 1, §§ 2 & 3).  The Osage CBM Lease is also for a primary term of 20 years and has a set royalty rate of 12.5% (*Id*., Ex. 2, §§ 2 & 3).[4]  BPI states that it could not begin its drilling until Defendants provided the necessary data as to where they intended to mine coal (referred to as "Mine Plan Blocks" or "MPBs").  In accordance with Section 3.8 of both CBM Leases, Defendants as "Lessor," were obligated to BPI as "Lessee" to do the following:

> LESSOR shall within ninety (90) days of the execution of this Agreement designate to LESSEE the area or areas of the Lease Premises that LESSOR plans to mine ("Mine Plan Block") and the order of priority in which they will be mined.  Each Mine Plan Block will be placed in an order of mining priority as follows: (1)

---

[3]  It is important to note that although the various agreements sometimes reference individual Defendants, in its Fourth Amended Complaint, BPI has made allegations that due to defendant Drummond's control over all of its affiliates (i.e., defendant IEC) and defendant IEC's control over defendants Christian, Shelby, Clinton, Marion and Vandalia Coal Holdings, LLC's, it is entitled to pierce the corporate veils of the LLC's against both IEC and Drummond, as well as pierce the corporate veil of IEC to pursue all of its claims directly against Drummond.  Thus, BPI often refers to all Defendants as the "Drummond Affiliates" or simply "Drummond" (Doc. 184, ¶¶66-69; Doc. 246, p. 1).  As such, throughout this Order, the Court also sometimes refers to these entities simply as "Defendants," except when necessary for it to specify which entity was the contracting party in certain agreements.  Additionally, the Court need not address the issue of whether it is appropriate to pierce the corporate veil in this case, as such issue is not integral to deciding Defendants' summary judgment motion.

[4]  BPI believed the royalty rates in both the CBM Leases to be "favorable" (*see* Doc. 184, ¶¶ 46-47).

within eight (8) years and (2) greater than eight (8) years.  Each Mine Plan Block can range in size up to twenty thousand (20,000) acres.

(*See* Doc. 238, Ex. 1 - Hillsboro CBM Lease, § 3.8; Ex. 2 - Osage CBM Lease, § 3.8.)

In addition, BPI and Defendants were to meet at least once a year to review mining plans to discuss and mutually agree upon, if necessary, any adjustment to the order of mining priority of the MPBs (*Id.*).  Section 3.8 of the CBM Leases also called for BPI to provide Defendants with an updated map every six months, showing the location of all of the existing and proposed gas wells and facilities located on the leased premises.  In exchange, Defendants were to provide BPI with an updated map every six months indicating the locations of any active or projected coal mining and other surface activities that might adversely affect BPI's operations (*Id.* at § 3.9).

BPI claims that the CBM Leases were doomed to failure from the start, as Defendants failed to provide the MPBs within the 90-day contractual window.  When Defendants actually did produce the MPBs, BPI complains they were not provided in good faith.  Rather, BPI believes the untimely MPBs were indicative of Defendants' effort to frustrate BPI's ability to preform under the CBM Leases, as Defendants designated the entire premises as land it intended to mine at once.  Next, Defendants forwarded substantially different revised drafts of the CBM leases, reducing the primary term from twenty to three years and increasing the royalty rates, thereby removing the consideration BPI had bargained for when it arranged for the transfer of its coal purchase options to the Coal Holdings LLC's.  Refusing to

renegotiate the CBM Leases, BPI gave Defendants notice that it was instituting the arbitration process.  When the Parties later met, Defendants gave BPI a Notice of Default as to the CBM Leases.  That same day, Defendants filed a declaratory judgment action in federal court in Alabama.[5]  Conversely, Defendants claim it was BPI who defaulted under the CBM Leases with respect to its obligation to acquire insurance on the CBM Leases for defendants IEC and Christian.  Defendants were also concerned that BPI appeared to be financially incapable of further performance under the Leases.

### III.  Discussion

**A.    Legal Standard**

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  **FED. R. CIV. P. 56©;** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997) (citing** *Celotex Corp. v. Catrett*, **477 U.S. 317, 322 (1986)).**  The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law.  *Santaella v. Metro. Life Ins. Co.*, **123 F.3d 456, 461 (7th Cir. 1997) (citing** *Celotex*, **477 U.S. at 323).**  This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant.  *Regensburger v. China*

---

[5]  The lawsuit was dismissed for improper venue and Defendants' declaratory judgment claim is now their counterclaim in this suit.

***Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Smith v. Hope School*, 560 F.3d 694, (7th Cir. 2009) ("[W]e are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences.") (citations omitted).** Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. ***Celotex*, 477 U.S. at 322.** While the Court may not "weigh evidence or engage in fact-finding" it must determine if a genuine issue remains for trial. ***See Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).**

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. ***Walker v. Shansky*, 28 F.3d 666, 670-71 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324).** No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." ***Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994).** In other words, "inferences relying on mere speculation or conjecture will not suffice." ***Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th**

Cir. 2009) (citation omitted); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].")**.** Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (citation omitted).

**B.    Analysis**

**1.    BPI's Fraud Claims**

BPI claims Defendants never intended to comply with any of their contractual obligations under the CBM Leases. Therefore, BPI pleads a claim for fraud in the inducement and a claim for promissory fraud. First, Defendants argue that the Illinois Statute of Frauds[6] bars these two fraud claims. Defendants next argue that BPI cannot demonstrate fraud as a matter of law as it cannot show Defendants intended not to perform under the CBM Leases or that it justifiably relied on Defendants' alleged promises. Third, Defendants argue that BPI cannot demonstrate any harm arising from Defendants' alleged fraud. BPI counters, asserting that its partial or full performance defeats Defendants' statute of fraud defense and further, that it can demonstrate Defendants' fraud as a matter of law.

---

[6] As jurisdiction of this suit is based on diversity, **28 U.S.C. § 1332**, under the *Erie* doctrine, courts will apply the substantive law of the forum state, absent certain exceptions not present here. *See Erie Ry. Co. v. Tompkins*, **304 U.S. 64 (1938)**.

### a.  Illinois Statute of Frauds

The Illinois Statute of Frauds reads, in pertinent part:

> No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party.

**740 ILL. COMP. STAT. 80/2 (2010)**.

Defendants argue that the statute of frauds should extinguish BPI's fraud claims because (1) the alleged agreement to convey "favorable" CBM Leases to BPI is not supported by a writing with the required prices and terms of sale; and (2) none of the definitive Coal Transfer Agreements include a promise to transfer a CBM Lease, let alone state the price and terms of sale for such a lease.  Defendants state that the Parties never previously agreed in writing as to what the price, royalty rates or other favorable terms of the CBM Leases were to be.  Instead, Defendants note that the MOU and LOI were the only documents preceding the CBM Leases, which addressed the possibility of a CBM Lease for the Hillsboro property, but that neither document specified any lease terms, and both the MOU and LOI were expressly non-binding.  Further, Defendants argue that any alleged promise made to include favorable terms within the CBM Leases would be considered "extracontractual" and therefore barred by the statute of frauds.

In response, BPI believes that Defendants' statute of frauds theory gives

way to the exception of BPI's full or partial performance.  BPI admits that its fraud claims rest on the premise that its creation of the Coal Holdings LLC's and the subsequent transfer of its coal purchase options to the LLC's so that Defendants could purchase the LLC's and exercise those options, was done in consideration of Defendants' promise to execute favorable CBM Leases.  BPI also states that it "obviously had no other duty to transfer coal rights[7] and LLC interests to Drummond; and Drummond had no other reason to execute CBM leases in favor of Plaintiffs.  Clearly, a contract was made for valuable consideration." (Doc. 246, p. 10).  In support, BPI cites the Seventh Circuit case of ***Gray v. Schoonmaker*, 119 F.2d 1010 (7th Cir. 1941)**.

First, the Court finds ***Gray*** does not support BPI's argument for full or partial performance, but actually works against BPI.  ***Gray*** acknowledged that when it was unclear as to whether a party's partial performance was made pursuant to two separate written leases or a separate alleged oral agreement, the district court did not err in ruling that the performance could not be solely attributable to the alleged oral agreement.  ***Id*. at 1013 ("[W]hile part performance in order to relieve from the operation of the Statute of Frauds need not necessarily be performance upon the land in question, yet such part performance must necessarily have a direct and positive relation to the subject matter of the oral agreement and must unquestionably have been carried out in furtherance thereof.  Where, as here,**

---

[7]  More accurately, from the various contractual agreements attached as exhibits, it appears BPI transferred its coal purchase options to the LLC's, not actual coal rights.

**the defendants in drilling the test well were acting harmoniously with the provisions of three separate agreements- two in writing, one in parol- it cannot with assurance be said that they were acting in pursuance of the parol agreement") (citations omitted)**.  In any event, the Seventh Circuit also believed that the statute of frauds barred enforcement of the alleged oral contract.  ***Id.* at 1013-14**.

Somewhat similarly, in this case, BPI's performance appears to be made pursuant to the terms of separate written agreements for the membership interest purchase and assignment of the various Coal Holdings LLC's (*see* Doc. 238, Exs. 9, 10, 13, 14, 19, 20, 24 & 25).  Yet, BPI believes that the terms of the MOU and LOI signify the Parties' intent to carry out the strategic alliance, all the benefits of which Defendants received but BPI did not.  In any event, while the MOU and LOI may have detailed the Parties' intentions of creating and maintaining a strategic alliance, thereby necessitating a symbiotic and evolving future contractual relationship, both the MOU and LOI were made expressly non-binding upon the Parties as to such future obligations.  Further, while BPI may have performed in an effort to carry out the overarching scheme to perpetuate this "strategic alliance," it also performed in accordance with several written contracts, thereby making it impossible for the Court to discern whether BPI's performance was attributable to the written agreements or the alleged "extracontractual" oral agreement.  Therefore, applying the rationale expressed by ***Gray***, performance cannot serve as an exception to the application of

the statute of fraud, which serves to bar enforcement of any "extracontractual" oral agreement.

In addition, it is of import to note that the Parties *did* enter into the CBM Leases which, BPI admits, were "favorable."[8]  The fact that the Parties have since reached a stalemate as to performance under these leases does not prove that an oral agreement existed as to the strategic alliance to avoid the statue of frauds requirement that such agreement be in writing.  Accordingly, the Court finds that the Illinois Statute of Frauds bars BPI's claims that Defendants fraudulently made an "extracontractual" oral agreement to carry out the favorable CBM Leases as well as other future promises concerning the "strategic alliance," as outlined in the non-binding MOU and LOI.  To be clear, contractual fraud cannot be the mere legal equivalent to a claim for breach of a party's promise to carry out its side of the contract.  Rather, the promise of a contracting party's performance is implied within the terms of said contract and thus, any alleged failure of the party to actually perform under the contract does not, in and of itself, give rise to an action sounding in fraud.

In sum, to the extent BPI alleges the existence of some type of "extracontractual" oral agreement between the Parties to support BPI's fraud claims, the Court finds such a claim would be barred.  Therefore, Defendants are entitled to summary judgment in this regard.  However, the Court does not find that the statute

---

[8]  BPI admits that initially, the CBM Leases that were executed by the Parties included "better-than-market" terms for BPI (Doc. 246, p. 8).

of fraud operates to bar BPI's claims of fraud concerning actual written contracts. Therefore, it must now turn to Defendants' remaining arguments on summary judgment, that BPI cannot show fraud as a matter of law.

### b. Fraud as a Matter of Law

#### i. Count I - Fraud in the Inducement

Defendants argue that BPI cannot demonstrate the requisite elements for its claim of fraud in the inducement. Under Illinois law, fraud in the inducement (also referred to as "fraudulent misrepresentation"), requires a showing that (1) the defendant made a false statement of material fact; (2) the defendant knew the statement was false at the time of making it; (3) the statement was made with the intent to induce the plaintiff to act; (4) the plaintiff acted in reliance on the truth of the alleged statement; and (5) the plaintiff suffered damages because of the reliance. ***Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980)**. The plaintiff's reliance must also be justifiable, that is, the plaintiff must have had a right to rely on the alleged misrepresentation. ***Id.*** Moreover, while the alleged false misrepresentation must be one of present or pre-existing fact, an exception has been made for a false promise as to *future* conduct when it is part of a scheme to accomplish the fraud. ***See, e.g., Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 92 (Ill. App. Ct. 2002)**. Specifically, Defendants assert that BPI cannot show that Defendants fraudulently misrepresented their intent to perform under the CBM Lease and further, if the Court were to find evidence of a fraudulent

misrepresentation, BPI cannot show its justifiable reliance.  In response, BPI argues that it was Defendants' actions which demonstrate that they never intended to honor the CBM Leases and that BPI's reliance on Defendants' statements was justified.

Clearly, BPI is relying upon the "scheme to defraud" exception. However, the evidence presented does not reveal a genuine issue of material fact as to the existence of such a scheme.  BPI argues that Defendants employed a scheme to defraud BPI out of its valuable coal options by promising to honor the favorable CBM Leases.  The allegations from its Fourth Amended Complaint which BPI believes demonstrate the existence of this scheme truly only show that Defendants did not provide compliant MPBs as required under the CBM Leases; Defendants instead claimed that BPI had defaulted under the terms of the CBM Leases and when it believed BPI failed to cure, it initiated proceedings to terminate the leases; Defendants subsequently proposed a revised CBM Lease with substantially different terms, which the Parties never executed.[9]

Any failure on Defendants' part to provide timely and compliant MPBs would, at most, amount to a breach under the leases.  Defendants' actions taken in response to their belief that BPI had defaulted under the leases simply signifies Defendants' ability to exercise their contractual rights.  Lastly, the Court finds nothing under in the law or pursuant to an existing contract between the Parties

---

[9]  Pursuant to its July 12, 2010 Order (Doc. 258), which granted in part and denied in part Defendants' Motion (Doc. 249)  to Strike Evidence Used in Plaintiffs' Summary Judgment Response (Doc. 246), the Court cannot consider many of the allegations referenced in BPI's Response (Doc. 246, pp. 11-12, ¶¶ 55-57, 59 & 63).

which would prevent Defendants from proposing a revised lease or other contract. When viewed collectively, the Court still cannot, in good conscience, find any question of material fact existing as to whether Defendants' engaged in a scheme to defraud BPI into surrendering its coal options in exchange for Defendants' full performance under the favorable CBM Leases.

More importantly, *assuming arguendo* that BPI could show a scheme to defraud, it can hardly demonstrate justifiable reliance. "Failure to prove justifiable reliance is fatal to claims of fraudulent misrepresentation . . . ." **Schrager v. North Cmty. Bank, 767 N.E.2d 376, 386 (Ill. 2002)**. The CBM Leases contained integration clauses, stating that each CBM Lease constituted "the entire agreement between the parties and supersede[d] any and all other written or oral agreements or understandings between the parties . . ." (*see* Doc. 238, Exs. 1 & 2, § 19). In addition, the other contracts between the Parties also contained integration clauses. Therefore, it would be unreasonable for BPI to believe that any obligations arising by virtue of a "strategic alliance" stemming from the language of the non-binding MOU and LOI would continue to adhere to the Parties, if not specifically included in any written contracts between the Parties. Given the fact that BPI is a sophisticated business entity which operated pursuant to the advice of counsel does little to aid its argument that it was justified in believing that the conceptualized "strategic alliance" would dictate the Parties' actions without a written and binding agreement thereto. The party claiming that it justifiably relied upon another's fraudulent misrepresentation or promise "may not ignore a manifest danger."

Page 18 of 25

*Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 646 (7th

Cir. 2002) (citing *AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035,

1042 (7th Cir. 1990)).

Inherent in every business venture is an element of risk. The decision

of whether to take the risk should be calculated, meaning that measured steps

should be taken to minimize the risk as much as practicable. Here, it appears that

BPI took a risk but did not act prudently to ensure that performance pursuant to a

"strategic alliance" would be guaranteed if there was no contractual obligation to this

effect. Allowing the various contracts to contain integration clauses, as well as

making the MOU and LOI non-binding may have constituted a sound business

strategy for other reasons, but in this specific instance, it only shows that BPI knew

or should have known that there was a risk that Defendants may not follow through

with any future plans for the strategic alliance.[10]  BPI proceeded to take the risk and

it has not seemed to pay off. Unfortunately, that is the nature of the beast. But it will

_____

[10]  Further, the fact that BPI seeks rescission of the agreements to return the Parties to
*status quo ante* does little to convince the Court to find justifiable reliance. Also, unlike BPI
suggests, the Court does not find rescission would even be an available remedy should it prevail.
In the Response, BPI states that it seeks to rescind the transfer of its ownership interests in the
various Coal Holdings LLC's. In essence, BPI states that it would reimburse Defendants the money
they paid to purchase ownership of the LLC's and to exercise the coal options. BPI claims it would
put Defendants back in the same position financially as it was before. BPI would then own the
various Coal Holding LLC's, along with the coal rights, which would then be conveyed to BPI's
creditors and stockholders through its bankruptcy estate. Although BPI claims this would return
the Parties back to their original positions, this is not entirely true. As Defendants point out, BPI
never owned the coal rights, just the options to purchase the coal rights. It was Defendants who
actually exercised the options to purchase the coal through the Coal Holdings LLC's. Therefore, it
appears BPI never owned title to the coal rights. BPI's proposed *status quo ante* is a virtual
impossibility. Rescission should not be allowed if the "*status quo ante* of the parties cannot be
restored." ***Klucznik v. Nikitopoulos*, 503 N.E.2d 1147, 1150 (Ill. App. Ct. 1987) (citations
omitted)**.

Page 19 of 25

not equate to fraud.  As such, Defendants are entitled to summary judgment on Plaintiffs' claim of fraud in the inducement.

### ii.     Count II - Promissory Fraud

The Parties' fraud in the inducement arguments are the same pertaining to BPI's claim for promissory fraud.  Generally, Illinois law does not recognize a cause of action for promissory fraud: knowingly making a false promise of future conduct upon which another party relies.  However, there is an exception to this general rule, applicable when the false promises made are shown to be part of a scheme to defraud.  ***Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009) (citing *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (citing *Bradley Real Estate Trust v. Dolan Assocs., Ltd.*, 640 N.E.2d 9, 12-13 (Ill. 1994)).**  For the reasons discussed previously, the Court does not find that a question of material fact exists as to the issue of whether Defendants' employed a scheme to defraud, nor that BPI has shown its reliance thereon was justified.  Therefore, summary judgment with respect to this claim must also be granted in Defendants' favor.

### 2.     Defendants' Counterclaim for Declaratory Judgment

Defendants also move for summary judgment in regards to their Counterclaim (Doc. 196) for Declaratory Judgment, seeking a final judgment holding that the notice of termination delivered by defendants IEC and Christian was proper and effective and ordering BPI to deliver a release and withdraw the notice of *lis*

*pendens* so as to effectuate the termination of the CBM Leases.

On February 9, 2007, defendants IEC and Christian delivered and sent BPI a Notice of Default pursuant to Section 8.3 of each of the CBM Leases, demanding that BPI cure these noted defaults within the 30-day cure period.  The specific alleged defaults were as follows, listing the corresponding section of each of the CBM Leases which Defendants believed imposed the defaulted obligation:

> Section 1.1: BPI failed to use its "best efforts to commercially produce all economically recoverable Gas";
>
> Section 2.1: BPI failed to conduct operations in a "prudent [and] reasonable manner";
>
> Section 3.9: BPI failed to provide "[e]very six (6) months after the date of this Agreement, . . . a map or maps . . . that describes the location of all existing and proposed Gas wells and facilities" to Lessors;
>
> Section 6.1: BPI failed to "conduct exploration, drilling, production and marketing in a reasonable and prudent manner"; and
>
> Section 15.1: BPI failed to maintain required insurance coverage.

(Doc. 196 - Counterclaim, p. 18, ¶ 8; *see also* Doc. 238, pp. 19-20, Ex. 36.)

For purposes of their summary judgment argument, however, Defendants believe that BPI's alleged failure to obtain and maintain insurance at all times under the leases is "the most straightforward example of a material breach . . ." (Doc. 238, p. 19, n.13).  Section 15.1 of the CBM Leases required, in pertinent part:

> LESSEE shall at all times during the Primary Term and any continuance of this Agreement maintain comprehensive general liability and automobile liability insurance and workers' compensation and employer's liability insurance with solvent

> insurance underwriters satisfactory to LESSOR . . . LESSOR
> shall be added as an additional insured as to policies for general
> liability and automobile liability.[11]

(Doc. 238, Exs. 1 & 2, § 15.1.)

Per the Notice of Default, Defendants sought assurance from BPI that it had adequate insurance covering the CBM Leases and that IEC and Christian were named as additional, primary insureds on BPI's insurance policies.  In response to the Notice of Default, BPI sent a letter from its President James Azlein, expressly denying that BPI was in default as to either of the leases and instead remained willing to abide by their terms (Doc. 238, Ex. 37).  After the 30-day cure period under the leases had expired and BPI had failed to provide proof of any insurance, Defendants sent the Notice of Termination and requested that pursuant to Section 2.2 of the leases, BPI execute and record a proper instrument releasing and terminating the leases (*Id.*, Ex. 40).  Rather than do as Defendants requested, BPI instead filed notices of *lis pendens* on the properties subject to the CBM Leases (*Id.*, Exs. 41 & 42).

In response, BPI asserts that it maintained insurance coverage pursuant to the leases, but was not initially aware that it had failed to name IEC and Christian as additional insureds.  Upon receipt of the Notice of Default, BPI states that it added IEC (and Christian, as an IEC affiliate) as additional insureds within the 30-day cure period under Section 8.3 of the leases.  In support of its assertions, BPI offers the

---

[11]  In the Hillsboro CBM Lease, defendant IEC is identified as the "LESSOR" (*see* Doc. 238, Ex. 1), and in the Osage CBM Lease, defendant Christian is identified as the "LESSOR" (*Id.*, Ex. 2).

affidavit of James G. Azlein, President of BPI (Doc. 246, Ex. 16).[12] Azlein avers that on February 15, 2007, six days after the Notice of Default, BPI's insurance broker issued formal confirmation of BPI's insurance and the additional insureds (*see* Doc. 246, Ex. 16, ¶¶ 10, 12).  He claims he forwarded copies of the Insurance Certificates to its counsel, assuming notice of compliance would then be provided to Defendants (*Id*. at ¶ 12).

Although Azlein assumed that notification had been provided to Defendants, he did not have any personal knowledge of that fact nor has BPI offered evidence to support this notion.  However, BPI argues that notification of its cure is not actually required under the terms of the CBM Leases.  The Court agrees.  Section 8.3 of the leases requires the defaulting party only to cure the default within thirty days (*see* Doc. 238, Exs. 1 & 2, § 8.3).  However, nothing in the language specifies the defaulting party must actually *notify* the other party of its cure (or attempt to cure) the default.  Further, Defendants' Notice of Default does not specifically request notice of cure be provided, so it also cannot be argued that BPI was aware that it was required to notify Defendants that it had obtained insurance for IEC and Christian as additional insureds (although evidence shows BPI may have assumed notice was provided).  Therefore, because evidence, namely the Certificates of Insurance attached to the Azlein affidavit, indicate that IEC and Christian (as an "IEC affiliate") were added as additional insureds within the 30-day cure period, this does not

---

[12] Pursuant to the Court's July 12, 2010 Order (Doc. 258) on Defendants' Motion to Strike, it will not consider either the second sentence in paragraph 5 or all of paragraph 13 of the Azlein affidavit, as such has been stricken.

appear to technically constitute grounds for a material breach of the leases by BPI.

As to the remainder of the defaults identified by Defendants in the Notice of Default, because they have not further elaborated on these items in their summary judgment motion, the Court cannot properly consider them at this juncture.  Thus, the Court finds that questions of material fact remain regarding Defendants' counterclaim for declaratory relief, thereby prohibiting summary judgment.[13]  Lastly, the Court notes that although BPI filed a motion to dismiss Defendants' counterclaim (Doc. 193), which was denied (Doc. 253), it is not readily apparent from the docket that BPI ever filed its answer to Defendants' Counterclaim (Doc. 196).

---

[13]  As does the possibility of Defendants' alleged breach of contract for failing to provide timely and sufficient MPBs to BPI under the terms of the CBM Leases.

## IV.  <u>Conclusion</u>

As discussed herein, the Court hereby **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 238).  Defendants are hereby granted summary judgment in their favor as to all Counts of Plaintiffs' Fourth Amended Complaint (Doc. 183).  As such, Counts I, II, III, and IV of Plaintiffs' Fourth Amended Complaint (Doc. 183) are hereby **DISMISSED WITH PREJUDICE**. However, summary judgment is denied with respect to Defendants' Counterclaim for Declaratory Relief (Doc. 196).  Therefore, the Court hereby **REFERS** this matter back to the Magistrate Judge in order to schedule another settlement conference.  In addition, the Court will schedule the Final Pretrial Conference, the date and time of which to be determined.

**IT IS SO ORDERED.**

Signed this 17th day of September, 2010.

/s/        David R Herndon

**Chief Judge**
**United States District Court**